Good morning, Your Honors. Good morning. May it please the Court, my name's Christopher Cannon. I've been appointed to represent Felix Valdovinos. The thing that's really important to emphasize is that this is a very thin case. It was a very thin case. It's dependent totally on identifications, and there was no need to have these unnecessarily unreliable identification procedures in this case. The State and District Court said that these unnecessarily unreliable identifications don't rise to the level of reversible Brady obligation because counsel was able to use that same information in cross-examining the witnesses. Well, I would find this a lot easier to reverse on Brady grounds if it was a direct appeal. It's epidephrines that really concerns me. And I understand that. And the reason, because of AEDPA, there are two reasons why I think this case should be reserved. One, the question is, do you have confidence in the verdict, even under AEDPA? That's the decision that the California Supreme Court should have made. That's the decision that the District Court should have made. And I don't see how looking at this record, any reasonable court can have confidence in the verdict. When you look at the District Court opinion denying habeas, Judge Wilkin analyzed each particular failure to disclose a piece of substantial Brady information as, well, that particular piece does not cause me to, does not raise a reasonable doubt. I think those are the exact words she used. She listed each piece of evidence and said that piece does not raise a reasonable doubt. Well, the real standard that you're supposed to look at is whether the failure to disclose all of the items when taken together undermines confidence in the verdict. And under AEDPA, it clearly does. So I think this is a case that should be reversed. In addition, the other kind of unfair and inaccurate construction of the law, both in the California Supreme Court and by Judge Wilkin, is that when it comes to recovering from the prejudice, because it's clear that there was prejudice here, but the courts argue that there was a reduction of that prejudice through cross-examination of the ID witnesses. Well, cross-examination of an ID witness is not a constitutionally sufficient way to recover from the prejudice. That's not totally so. I mean, a lot of this, the prosecution should have given it to you well before the trial, and they didn't. And it looks as though that's probably because the police didn't give it to the prosecutor, and they should have. Under ZUNORC, which you cited, there's no question that the government doesn't escape the consequences of a Brady violation by having a pure-hearted prosecutor that the police don't give things to. However, most of the Brady materials, they seem to have given to the defense just before trial or during trial, so the defense got to use them. But they didn't get to use them, because when it comes to Aurelio Lopez, whose preliminary hearing testimony was read in at the trial. Well, the thing about Lopez is he was already very plainly impeachable. And also, he looked like he was more covering for Valdivinos instead of accusing Valdivinos at the preliminary hearing. There are two. What the court just stated is reasonable, and there are two separate answers to the two-point statement that the court made. One, the Court of Appeals can't substitute its own judgment as to whether Lopez was being covered, was covering, or was not covering. That's a decision that the jury's supposed to make. So that's an unreasonable interpretation. That's the Court of Appeals putting itself in as the fact finder. The second thing is that it's very different, because when the preliminary hearing occurred, the only impeachment was that Lopez was on probation. What do you need to impeach? He says he never saw Valdivinos with a gun, and he never saw Valdivinos shoot Caballeros. You don't want to impeach that. You want to hammer it. Exactly. But also, in his preliminary hearing testimony, he testified that he did put a gun in Valdivinos' hand. And trial counsel referred to that as Lopez is the critical witness, because he puts my client at the scene with a gun in his hand. That's how trial counsel described Lopez's testimony. And when you look at that testimony, back to the impeachment and why the late disclosure of the gun and the drugs was insufficient, Mr. Lopez had been on probation for gun possession. He had been on probation for drug possession. He was then arrested on a probation violation. Let me ask you something else about the Brady on Lopez. The way this came up in Zuno-Arce on timing of Brady disclosures was sufficiently before trial so that the defense can make practical and effective use of whatever exonerating or impeaching evidence there is. Ordinarily, the phrase used in these cases is before trial. Your claim on Lopez is that the Brady disclosure should have been sufficiently before the preliminary hearing so that it could be made use of. Now, I never heard that before, and I don't recall seeing a citation about timing that required that Brady disclosures have to be before the preliminary hearing. It seems odd to me, because in many states, well, like Alaska, if the person gets indicted first, there's no preliminary hearing, because the only purpose of a preliminary hearing is to decide whether to hold somebody until indictment. That's because Mr. Lopez didn't testify at trial. I know. What happened was... Wouldn't a prosecutor be fled, as I recall. But still, I'm not aware of any law that says that Brady disclosures have to be made before the preliminary hearing because there's always a possibility that the witness will be dead or gone or unavailable. I agree. It has to be made in time to be useful. And in this case, because the prosecution... So this should be before trial in order to be useful at trial. In order to be useful at trial. Is there a case that says Brady disclosures have to be made before preliminary hearing? No, Your Honor, but that's really not the issue here, because if the prosecution had not chosen to failure to disclose the Brady information, and then had not chosen to not keep Mr. Lopez around, and then had not chosen to go forward with... I thought he was in the wind on his own. I think that there was substantial cooperation by the Santa Clara District Attorney's Office because when he was arrested on the probation violation, you have an illegal alien with guns and with drugs arrested. All of a sudden, he gives testimony that helps the case, and he's restored to probation. The new case isn't brought, and then they claim, oh, somehow we lost track of where this guy is. In Santa Clara County, it's just crazy to think that there wasn't some quid pro quo going on here. And that's why... I don't see how you can... Oh, sorry, go ahead. Oh, no, and that's why it's so important that they didn't disclose the new guns and the new drugs, because that goes to show that there was a quid pro quo for the testimony. They didn't prosecute him for the new guns. They didn't prosecute him for the new ounce of methamphetamine. They let those charges go away. And as a result of letting those charges go away, they restored him to probation. He got out of jail. After he testified, he left. Counsel, I don't see how you could require prosecutors to make the disclosures before preliminary hearing. The way I remember preliminary hearings, at least in Alaska, they come up really fast because the defense wants them right away so that an indictment won't prevent them from ever happening. I understand in California, they have a statute, so you can get one later, and I don't know quite why. But they happen really fast. And typically, the prosecutor and the police don't even have all their stuff organized by the time it happens. It's a real hurry-up job for them, kind of like a hearing, if the judge allows one, on a temporary restraining order. Couple days at most to prepare. Not all the files are gathered. How, as a practical matter, can we assure disclosure? I think we can easily ensure disclosure because, one, now that Crawford has been decided, the preliminary hearing testimony wouldn't come in anyways. So this is really a situation that's not gonna happen again. Two, if the prosecution, for somehow, is trying to use prior testimony, they have an obligation to, one, ensure that the person who's testifying is available for... Ordinarily, they're not gonna wanna use it. They're gonna wanna put the person on at trial. But if somebody literally goes south on him, because he'd rather not risk being charged with murder himself, well, they're stuck with what they've got. They just lost their witness. And if they're stuck with what they've got, they're stuck with the disadvantages of not keeping track of that person, and they should be the one who has the evidence. If they don't give it up in time to be used, it's their fault. That shouldn't be on the defendant. I'm not saying that there's always an... Lopez says, gee, shall I stick around for trial and maybe getting charged with murder, or shall I flee? I think I'll flee. And that's the prosecutor's fault? Under this circumstance, yes, because the prosecutor could easily have kept him here by charging him on the new case that they had ample evidence of, but they simply did not do that. And that's why it was... Counsel, here, did they request that his testimony not be read into the record in the trial? Was that motion made? Yes, that motion was made. That motion was made and denied. Yeah. I think you should turn to your other Brady claims. The other Brady claims, not disclosing the prior identification proceedings is indefensible in this case. Counsel, it is. However, it strikes me that defense counsel made great use of it. His own outrage was obvious, and it was justified. And he got to cross-examine by showing the jury this big surprise. There were previous covered up photo IDs, photo lineups, where these people had not identified Valdivinas. But the late disclosure was critical because what happened was, as a result of the late disclosure, the witnesses were exposed to repeated photographs of the defendant. Then he asked for a blackboard preliminary hearing so that he could test the witness's recall. He wasn't able to have a blackboard preliminary hearing. The witnesses were exposed to Valdivinas sitting at counsel table in a red jumpsuit with shackles on. Anybody who comes into court, sees someone sitting next to a defense lawyer wearing shackles, wearing a jail jumpsuit, is going to know that's the guy. And that could have been prevented. And that's why it was so prejudicial in this case. In addition, what was really prejudicial, the jury that convicted Valdivinas hear that both of these witnesses had failed to identify him in the photo lineups and also that the photo, that their failure was hidden from the defense? Yes, but there's a big difference in arguing about what should have happened and having the ability to pin that person down as to their actual recollection, knowing what the true facts are. And that ability to pin them down was really lost. Finally, there's the letter where there was a letter in the police file indicating that this was a drug killing. And it was really important that that wasn't turned over because that led to essentially false prosecutorial vouching that saying, oh no, this wasn't a drug killing. Officer Alcantara got up there and testified and said, oh no, in all of our files, there's nothing to indicate that there's a drug killing. And he was questioned specifically on that by the district attorney on two occasions. And he was allowed to testify falsely. Or whether it was a drug killing. Because the defense theory was that it was a drug killing and that Valdivinas wasn't involved in it. The prosecution theory was this was just some sort of bar fight. So by indicating that it was a drug killing, it supported the defense theory of the case. And I would just like to save my remaining minute to respond to the prosecution. Thank you, counsel. Thank you. Of course, I'll answer all the court's questions about the substance. But I think the procedural questions here, which have not yet been discussed, are actually the most important part of this case. And one of the procedural aspects are these two Brady claims that were certified in the Certificate of Appealability that were. Counsel, help me on one of them. What made the identification look most persuasive, you've got a bunch of lowlifes in a bar fight. And what made the identification of Valdivinas as the shooter especially persuasive is the cowboy hat. But then it turns out it's a cowboy bar and a whole bunch of people wearing cowboy hats. And I gather there was some picture of somebody else wearing a cowboy hat that was hidden from the defense, not disclosed to the defense. When did they get that picture? The police took picture after it was all over, as I recall. Well, that was the allegation. In trial counsel's affidavit, we don't even know that trial, he didn't even mention that picture. We don't even know that trial counsel was unaware of that picture. So as far as we know, there was no Brady violation with respect to that at all. This is a picture of Mongia in a county. Exactly. And if you look at trial counsel's declaration, he simply does not mention it. Now, he does mention that letter. But all he says about that letter is that I was not aware of the letter. He doesn't say anything about whether he was aware of the substance of what was written in the letter or what he would have done had he known about the letter or how it possibly would have helped him. And the letter is utter rubbish in any case. We don't even know when that letter got into the police file. I don't know if it's rubbish. If I was a defense lawyer, I'd sure want to see a letter where there's a different theory and there's a name so I could follow it up. We don't know that the defense lawyer did not know about that name. We have no way of knowing that. As far as we know, on this record. Whether we knew or not, it's the prosecution burden to disclose exonerating and impeaching material. It is certain. There's no excuse that, well, we don't know if the defense doesn't know this. I agree. It's the prosecution's burden and obligation to disclose it. But on this record, we don't even know that the prosecution had it to disclose. This letter was addressed to this Eulalio Calabria. It was the police department, right? No. The letter was found in the police file, but we don't know how it got there or when it got there. All we know is that it was. You're saying that the defense, the habeas lawyer, planted a letter in a police department file? No. What I'm saying is that the habeas lawyer in 2004, more than five years later, discovers this letter there. It is entirely possible that the prosecution did not have that letter until 2003. We don't know how it got there. We know when it was dated. We know it was undated. There's a postmark on the envelope outside of it, OK? But it's addressed to this Eulalio Calabria. I'm surely pronouncing the name wrong. We don't know when he got it. We don't know if he got it. We don't know who turned it over. We don't know when it was turned over. All of this stuff fails to show that the prosecution had it to turn over. Do you have an affidavit that says he didn't get it? Counsel, whose obligation is it to prove when the letter got there? All we know is that it was in their file. It hadn't been turned over. Isn't that enough? Unless you can show by some concrete evidence that it got there later or after trial or whatever. Had the defendant simply asked at the police department when this documentation, had they made any effort at all to find out when this documentation arrived, you might have a valid point there. But there's nothing about that. But whose burden is it? Shouldn't the government have come forward? Come forward when? Well, and said, look, this letter wasn't in our file until such and such a date. That's not my understanding, but I can't cite you authority on it. I gather you have no authority for that. Do you have an affidavit that I missed in the record? I have an affidavit from the counsel. Let me finish my question. Do you have an affidavit in the record that says, we didn't get this letter into our file until after Valdovinos' trial? No, we don't have such an affidavit. If trial counsel or, not trial counsel, if the investigator had asked, made any offer. You're not getting why I'm asking these questions, let me tell you. The reason I'm asking these questions is once you find out if you're a defense lawyer or judge that the prosecution has hidden something that they should have disclosed to the defense, defense lawyers and judges tend to suspect there may be more. And that all they're finding out about is the little bit that they already found out about, and that there's still more being covered up. And at some point, when it looks like there's cheating going on, you need the prosecutor to show that everything's been disclosed at this point, and everything's fair and square. And then when there's a letter that, from all appearances, got there in advance, or got there early enough, so it could have been the basis for a motion for new trial, and it wasn't disclosed, I don't see why we should just assume that everything's been disclosed to the prosecution side and put the burden on the defense to prove somehow that it got there in time to be disclosed to them when they wouldn't know. Let's assume that you're right and I'm wrong. These files? That this was in the, let's assume that this was in the, and it should have been disclosed. Then the question becomes, what value is this letter? OK? This letter could have been written by Valdevinos himself. It is somebody who is denying responsibility for killing the victim. Could have been. It may be all phony. It'd be nice to be able to track that down before trial. What would be nice is for defense counsel to say, I had no knowledge of Mr. Belamos or any of this, any of the allegations in this letter. Defense counsel, trial counsel does not even say that. He simply says he was unaware of the letter. We, it was. Is there any reason to think they were aware? The only way they'd become aware is if it was given to them since it was sent to the police. And I don't, I'm sorry, I don't mean that he, let's assume that he's right, that he was unaware of the letter. But the question is the information in the letter. OK? There's every reason to assume that he was knowing that this was a drug deal, or thinking that this was a drug deal gone bad, was investigating these possibilities. And for all we know, this is a letter that was written by the defendant, and the defendant could easily have given all this information to trial counsel. We know the prosecutors, the prosecution, I don't know if it's the police or prosecutor or who, that they just plain cheated. They did a bad thing that was unconstitutional to deprive Valdevinos of his rights by not disclosing the failed photo line-ups. Once we know that, it seems to me that when we've got a letter in the police files saying, well, maybe they knew anyway, we shouldn't indulge speculation in favor of the prosecution. They've got a burden to disclose Brady material. And I want to know if they did it, and if it wasn't Brady material because they got it late or something after the trial, I need there say so. I'm not sure I'm understanding that question. I guess not. I'm trying to be responsive in the sense that you seem to be saying that the past failure to disclose the identifications goes toward the question of whether the prosecution failed to disclose this additional thing. And I don't have any authority on that as well. Well, there's a jury instruction we give, falsus in unis, falsus in omnium. You're familiar with the form instruction? Ladies and gentlemen of the jury, if you conclude that a witness lied about one thing, you can conclude, if you wish, that he lied about everything. The jury was instructed. We know here that the prosecution was dishonest about two things, the two failed photo line-ups. In a case where identification is the whole case. Yes, but as was discussed before, the constitutional question is not merely whether you're dishonest or negligent or whatever, or unreasonably or impermissibly fail to disclose. It is the effect that you have, that that misbehavior has on the trial. And there wasn't any effect here, because trial counsel, defense counsel, got up and exploited not just the misbehavior, but the actual evidence. He used the evidence as best he could. And in particular, he used the gun evidence. Now we're not talking about the ID, but the gun and the drug evidence. He used them to great effect. Is this guy Bulemos? Did his name ever come up, Ramon Bulemos, in the trial? No, not that I know of. The letter said that it was a contract killing, because Caballero owed money to Ramon Bulemos. So I'm trying to explore what you say, that they may well have known all about what the letter said. They may have even written a letter. And one way that I could help figure that out is if they put on evidence that Caballero owed money to Ramon Bulemos. But if Ramon Bulemos' name never came up, it suggests that they did not. As far as I know, it did not come up. But all that shows is that it was a dry well, or it could very well have been a dry well, that was investigated. And there was nothing there. On the gun and on the drugs, the defense counsel, as you indicated before, he hammered this, saying that this showed that there was a quid pro quo, that Aurelio Lopez was saying what the cops wanted to hear. And that's why he got let go, and that it was all a big deal. And I must correct counsel. It was not the preliminary hearing testimony that, per se, had put the gun in the hand of the defendant. It was the prior statement to the police, which was adduced at the preliminary hearing, not only by the prosecutor, but by defense counsel, who wanted to get that in to impeach Lopez at the preliminary hearing, to show that he was being inconsistent, and to show that this was all part of a deal in which Lopez would say whatever he needed to say to get out. And as you indicated, he used this to a great effect in closing argument. Well, I haven't gotten to the procedural stuff, but the stuff, including the letter, should not be considered on the merits by this Court, because counsel delayed unreasonably in going back to exhaust. It took him nine months. There was no excuse for it whatsoever. He says in his reply brief that, well, it was the state's fault, because we raised the exhaustion question in the first place. And that is perfectly true, that we did raise the exhaustion question in the first place, but it's also perfectly absurd. It's like saying, I didn't file my brief on time, because I had to file a brief in the first place. There was no excuse for that. Rines v. Weber says, ordinarily, you get 30 days. Counsel says, or defense says, that applies only to capital cases or cases. Do I get this issue right? I thought they exhausted on some of the Brady issues, but not all of them. And then, when they came up with more Brady issues that they wanted to exhaust, the judge let them exhaust the issues in state court and then relate back as part of the Brady claim. And that's what the judge did wrong. The judge, she allowed them to amend after they took nine months to just go back and exhaust these additional Brady claims. And it wasn't a big deal to exhaust them. All you had to do was basically say what you had said in your traverse, say it to the state Supreme Court. Was there proof they knew about these other Brady claims at the time they exhausted them? Yes, because it was all in the traverse, right? And then they take nine months. They're supposed to file quarterly status reports. They blow off that, too. They don't do that. And the judge says, well, delay alone will not cause you not to be able to amend. That's not Rines v. Weber. Rines v. Weber cited the Zarvella case for the principle that ordinarily you get 30 days. Counsel says that only applies to the other. Is it correct this is not a statute of limitations issue until we get past the discretion issue? There's discretion about whether to allow the amendment. If the amendment is not allowed, then the statute of limitations bars the additional claims. Is that the way it works? I'm afraid I didn't understand that question. Are you speaking about the relation back question or? Yes. It depends on the judge allowing amendment of the petition. Well, I don't think that's right. I think the judge has to say, A, you did this in a reasonable amount of time, and we contended that they didn't, and B, that your claims relate back. And we very strongly urge that these claims do not relate back. Does she have discretion on that, or do we review de novo? I don't have authority. I would say that on the first question, it would seem that there would be discretion based on reasonableness. But on the second question, on relation back, that seems to me to be strictly a question of law. And so you would review de novo. Thank you. Thank you, counsel. Would you tell the technician that you're getting a lot of back feed from you, Judge Kleinfeld? Thanks. Is there anything I can do to prevent that, or anything any of us can do to deal with that echo problem? No, it's all up to the technician. Thanks. Thank you, Your Honor. Thank you, Your Honor. Just on the relation back issue, I'd just like to indicate that we indicated in district court that we didn't want to have to go back to state court, that these Brady claims were part and parcel of the same claim, that they were just supplemented by additional information that we got from the police file, so there was no reason to go back. And the claims should all relate back. We tried to avoid going back to state court, and the prosecution is now claiming, because it took nine months to go to state court and come back to district court, that that should somehow make this case untimely. Let's assume, for purposes of discussion, that you did need to exhaust. Is there some excuse for not doing those other Brady claims when the first ones were exhausted? The Brady material had not been discovered when the first claims were exhausted. What happened was, the original Brady claims were made partially in the pro per habeas. After I got appointed to represent him, I sent an associate down to look at the police file. That's when the additional material was discovered. We then supplemented the traverse with the additional material, claiming that it only supplemented the original Brady claims. Mr. Friedlander filed a petition saying, oh, no, these are new claims. These are new facts in support of the claims. You have to go back to state court. We then went back to state court, finished in state court, came back to federal court, and now the state is claiming, because we took so much time in state court, that this court shouldn't address this issue. When it comes to the defense lawyer being able to use this information to kind of hamper him on the closing argument, there's a big difference between arguing to a jury and cross-examining the witness on the stand about the deal he got. That's a huge difference, because you get to see how he's carrying himself, how he's looking, what's going on. None of that is able to be accomplished. There's a huge difference in prejudice when you're talking about identification, when you're talking about someone, when you can ask them questions about what they saw, how tall was someone, what were the color of their eyes, what were they wearing, where was their hat, when you can ask them specifics when they don't have the person sitting next to them in the courtroom. That opportunity was lost. And finally, it was prejudicial because the letter was used to undermine the defense theory of the case and support, well, I'm sorry, the letter supports the defense theory of the case, and the prosecution got their main witness up there to testify and say, oh no, in our investigation, there's nothing in our file that shows that this is a drug-related killing. Well, in fact, that was a solicitation of false testimony, as shown by the letter in the file, and that letter wasn't disclosed. This is a case that, under AEDPA, should go back. Thank you. Thank you, Counsel. Valdovino v. McGrath is submitted.
judges: Fletcher B. , Kleinfeld, Duffy